Frank S. Hedin (SBN 291289)
Hedin LLP
535 Mission Street, 14th Floor
San Francisco, CA 94105
Telephone:   (305) 357-2107
Facsimile:    (305) 200-8801
E-Mail:        fhedin@hedinllp.com

*Counsel for Plaintiff and*
*the Putative Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEIDI FENTON, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br>  v.<br><br>CHURCH OF SCIENTOLOGY INTERNATIONAL,<br><br>                    Defendant. | Case No.  2:25-cv-1277<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Heidi Fenton, individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations pertaining specifically to herself or her counsel, which are based on personal knowledge.

# **NATURE OF THE CASE**

1.     Plaintiff brings this action to redress the practices of Defendant Church of Scientology International ("Defendant") in knowingly disclosing Plaintiff's and its other consumers' identities, the titles of the prerecorded video materials they requested or obtained from the www.scientology.org website or www.scientology.tv streaming platform to Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc. ("Facebook"), in violation of the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2.     Over the past two years, Defendant has systematically transmitted (and continues to transmit today) its consumers' personally identifying video viewing information to Meta using a snippet of programming code called the "Meta Pixel," which Defendant chose to install and configure on its www.scientology.org website or www.scientology.tv streaming platform (the "Websites").

3.     The information Defendant disclosed (and continues to disclose) to Meta via the Meta Pixel includes each consumer's personally identifying Facebook ID ("FID")[1] and information that reveals the title of the specific prerecorded video

---

[1]      As alleged in greater detail below, an FID is a unique sequence of numbers linked to a specific Meta profile.  A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser allows anyone, including Meta, to view the Meta profile of the person to whom the FID corresponds.  Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person.

material that each consumer requested or obtained on its Websites (hereinafter, "Private Viewing Information").

4.    Defendant disclosed and continues to disclose its consumers' Private Viewing Information to Meta without asking for or obtaining their consent to these practices.

5.    The VPPA clearly prohibits what Defendant has done. Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

6.    Accordingly, on behalf of himself and the putative Class members defined below, Plaintiff brings this Class Action Complaint against Defendant for intentionally and unlawfully disclosing their Private Viewing Information to Meta.

## **<u>PARTIES</u>**

### **I.    Plaintiff Heidi Fenton**

7.    Plaintiff is, and at all times relevant hereto was, a citizen and resident of Elk County, Pennsylvania.

8.    Plaintiff is a subscriber to Defendant's www.scientology.tv Website, which provides access to prerecorded video materials. Plaintiff obtained her

subscription on or about November 27, 2024, by providing her name, email address, and password for continuous association with her subscription.  Accordingly, Plaintiff is therefore a consumer of Defendant's Website.

9.    At all times relevant hereto, including when requesting or obtaining prerecorded video material as a subscriber to Defendant's Website, Plaintiff had a Meta account, a Meta profile, and a personally identifying FID associated with such profile.

10.    Plaintiff has watched prerecorded videos on Defendant's Website through her subscription while logged into Facebook during the preceding two years.

11.    When Plaintiff requested or obtained prerecorded videos on Defendant's Website while using her subscription, Defendant disclosed to Meta Plaintiff's FID coupled with the specific titles of the videos she requested or obtained (as well as the URL where such videos are available), among other information about Plaintiff and the device she used to request or obtain such video materials.

12.    Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Private Viewing Information to Meta.  In fact, Defendant has never even provided Plaintiff with written notice of its practices of disclosing its subscribers' Private Viewing Information to third parties such as Meta.

13.    Because Defendant disclosed Plaintiff's Private Viewing Information (including her FID, the titles of the prerecorded video materials she viewed through her subscription to Defendant's Website, and the URL where such videos are available for

viewing) to Meta during the applicable statutory period, Defendant violated Plaintiff's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

## II.   Defendant Church of Scientology International

14.   Defendant is a tax-exempt, senior ecclesiastical management church of the Scientology religion that is incorporated in California and maintains its headquarters and principal place of business in Los Angeles, California.  Defendant operates and maintains various Websites, including www.scientology.org and www.scientology.tv, where it offers and sells prerecorded videos, online courses, and a television network library of prerecorded videos to consumers.

## JURISDICTION AND VENUE

15.   The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

16.   Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal place of business in Los Angeles, California, within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

17.   The VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Meta) information that personally identifies consumers

1  (like Plaintiff) as having requested or obtained prerecorded video materials or other

2  audio-visual materials.

3      18.    Specifically, subject to certain exceptions that do not apply here, the

4  VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any

5  person, personally identifiable information concerning any consumer of such

6  provider[.]"  18 U.S.C. § 2710(b)(1).  The statute defines a "video tape service

7  provider" as "any person, engaged in the business . . . of rental, sale, or delivery of

8  prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. §

9  2710(a)(4).  It defines a "consumer" as "a renter, purchaser, or subscriber of goods or

10  services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  "'[P]ersonally

11  identifiable information' includes information which identifies a person as having

12  requested or obtained specific video materials or services from a video tape service

13  provider."  18 U.S.C. § 2710(a)(3).

14      19.    Leading up to the VPPA's enactment in 1988, members of the United

15  States Senate warned that "[e]very day Americans are forced to provide to businesses

16  and others personal information without having any control over where that

17  information goes."  *Id.*  Senators at the time were particularly troubled by disclosures

18  of records that reveal consumers' purchases and rentals of videos and other audiovisual

19  materials because such records offer "a window into our loves, likes, and dislikes,"

20  such that "the trail of information generated by every transaction that is now recorded

and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

20.     Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes."  134 Cong. Rec. S5399 (May 10, 1988).  As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people."  *Id*.

21.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile

apps and other new technologies have revolutionized the availability of Americans' information."[2]

22.     Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[3]

23.     In this case, however, Defendant deprived Plaintiff and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Private Viewing Information to Meta, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.    Consumers' Personal Information Has Real Market Value

24.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything

---

[2]     The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the- 21stcentury.
[3]     Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[4]

25.    Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[5]

26.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency.  The larger the data set, the greater potential for analysis – and profit.[6]

27.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[7]

---

[4]    Transcript, *The Information Marketplace* (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[5]    *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), available at https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

[6]    Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, available at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

[7]    *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ .

1    28.    The scope of data aggregators' knowledge about consumers is immense:

2  "If you are an American adult, the odds are that [they] know[] things like your age,

3  race, sex, weight, height, marital status, education level, politics, buying habits,

4  household health worries, vacation dreams—and on and on."[8]

5    29.    Further, "[a]s use of the Internet has grown, the data broker industry has

6  already evolved to take advantage of the increasingly specific pieces of information

7  about consumers that are now available."[9]

8    30.    Recognizing the severe threat the data mining industry poses to

9  consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-

10  Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking

11  information on how those companies collect, store, and sell their massive collections

12  of consumer data, stating in pertinent part:

13    By combining data from numerous offline and online sources,
       data brokers have developed hidden dossiers on every U.S.
14    consumer. This large[-]scale aggregation of the personal
       information of hundreds of millions of American citizens raises a
15    number of serious privacy concerns.[10]

16  [8]    N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16,
     2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-
17  consumer-database-
     marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2
18  C%20much%20more.

     [9]    Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and
19  Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at
     https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

     [10]    *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving
20  Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012),
     available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-
     query-data-brokers-about-practices-involving-consumers-personal-information.

31.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Onnit share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

32.     Disclosures like Defendant's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]

33.     The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

---

[11]     *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.

[12]     *Id*.

[13]     Prepared Statement of the FTC on "Fraud Against Seniors" before the Special Committee on Aging, United States Senate (August 10, 2000).

34.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.   Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

35.     Defendant is not alone in violating its consumers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing consumer information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice.  Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

## II.    Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

36.     As the data aggregation industry has grown, so too have consumer concerns regarding personal information.

37.     A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do protect their privacy online.[15] As a result, 81 percent of

---

[14]     *Id.*

[15]     *See    2014    TRUSTe    US    Consumer    Confidence    Privacy    Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

12

smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

38.    Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.  In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

39.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

---

[16]    *Id.*

[17]    *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[18]    *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

40.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]   As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

### III.    Defendant Uses the Meta Pixel to Systematically Disclose its Consumers' Private Viewing Information to Meta

41.     As alleged below, whenever a subscriber to Defendant's Websites who has a Meta account requests or obtains prerecorded video material from Defendant on its Websites, the Meta Pixel technology that Defendant intentionally installed on its Websites transmits the subscriber's personally identifying information and detailed Private Viewing Information (revealing the specific titles of the prerecorded video material that he or she requested or obtained alongside the URL where it is available) to Meta – all without the subscriber's consent, and in clear violation of the VPPA.

42.     Additionally, whenever a person with a Meta account purchases a prerecorded online video course from Defendant's www.scientology.org website, the Meta Pixel technology that Defendant intentionally installed on that website transmits the customer's personally identifying information and detailed Private Viewing

---

[19]     *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

Information (revealing the specific titles of the prerecorded video material that he or she purchased) to Meta – all without the customer's consent, and in clear violation of the VPPA.

### A. The Meta Pixel

43.     On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[20] Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

44.     The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendant to build detailed profiles about their consumers and to serve them with highly targeted advertising.

45.     Additionally, a Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts."[21] This is because Meta has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile

---

[20]     *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.
[21]     Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

15

and thus identify the user by name[22] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor.  As such, the FIDs assigned to Meta users are personally identifying within the meaning of the VPPA.  *See* 18 U.S.C. § 2710(b)(1).

46.    As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site. Meta states that "Examples of [these] actions include adding an item to their shopping cart or making a purchase."[23]

47.    Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[24]

48.    Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "contact information" and "event data" of their website's visitors to Meta.

---

[22]    For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

[23]    Meta,    "About    Meta    Pixel,"    available    at https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[24]    Meta,    "Meta    Business    Tools    Terms,"    available    at https://www.facebook.com/legal/technology_terms.

49.     Meta's Business Tools Terms define "contact information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[25]

50.     Meta's Business Tools Terms state: "You instruct us to process the contact information solely to match the contact information against user IDs [e.g., FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding event data."[26]

51.     The Business Tools Terms define "event data" as, *inter alia*, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[27]

52.     Website operators use the Meta Pixel to send information about visitors to their websites to Meta.  Every transmission to Meta accomplished through the Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the webpage's URL triggering the transmission.

53.     Depending on the configuration of the Meta Pixel, the website may also send event data to Meta.  Defendant has configured the Meta Pixel on its Websites to send event data to Meta.

---

[25]     *Id.*
[26]     *Id.*
[27]     *Id.*

17

54.     When website operators make transmissions to Meta through the Meta Pixel, neither the visitor's FID, the website URL, nor the event data are hashed or encrypted.

55.     Every website operator installing the Meta Pixel must agree to the Meta Business Tools Terms.[28]

56.     Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

57.     Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed.  Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

58.     Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take,"[29]

---

[28]     *See id.*
[29]     Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

including, as relevant here, the specific prerecorded video material that they purchase on the website.

### B. Defendant Knowingly Uses the Meta Pixel to Transmit the Private Viewing Information of its Consumers to Meta

59.     Defendant offers prerecorded video materials to subscribers of its Websites and sells prerecorded online video courses to consumers of its www.scientology.org website.   The prerecorded video materials that Defendant offers to subscribers include prerecorded videos of lecture excerpts, testimonials and informationals, preview videos of online courses, and other prerecorded shows, films, and news broadcasts.   The prerecorded video materials that Defendant sells to consumers include prerecorded lectures, and other Blu-ray and DVDs.

60.     To become a subscriber to Defendant's Websites, a person must provide his or her first and last name, email address and create a password.

61.     To make a purchase of prerecorded video material from Defendant's www.scientology.org website, a person must provide at least his or her name, email address, billing address, and credit or debit card details (or other form of payment information).

62.     Whenever a person with a Meta account requests or obtains prerecorded video material from Defendant on its Websites, Defendant uses – and has used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the

1  person who made the request and the specific title of video material that the person

2  requested or obtained, as well as the URL where such video material is available.

3      63.    In this way, among other methods, Defendant knowingly discloses to

4  Meta the Private Viewing Information of its consumers.    Specifically, when

5  subscribers click "play" on a prerecorded video on Defendant's Websites or when

6  consumers add videos to their virtual "cart" on Defendant's www.scientology.org

7  website and proceed through the checkout flow, the Websites execute a GET request

8  to Facebook's tracking URL "https://www.facebook.com/tr" and send it various query

9  string parameters and cookie values which disclose the name of the video requested or

10  obtained by the subscriber or consumer and the subscriber's/consumer's FID.

11      64.    Defendant intentionally programmed its Websites to include the Meta

12  Pixel code in order to take advantage of the targeted advertising and other

13  informational and analytical services offered by Meta.    The Meta Pixel code

14  systematically transmits to Meta the FID of each person with a Meta account who

15  request or obtain prerecorded video materials on its Websites, along with the specific

16  title of the prerecorded video material that the person requested or obtained (including

17  the URL where such material is available).

18      65.    With only a person's FID and the title of the prerecorded video material

19  (or URL where such material is available) that the person requested or obtained from

20  Defendant on its Websites—all of which Defendant knowingly provides to Meta on a

systematic basis—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the person requested or obtained. This can be accomplished simply by accessing the URL www.facebook.com/[*insert the person's FID here*]/.

66.     Defendant's practices of disclosing the Private Viewing Information of its consumers to Meta continued unabated for the duration of the two-year period preceding the filing of this action.  At all times relevant hereto, whenever Plaintiff or any other person requested or obtained prerecorded video material from Defendant on its Websites, Defendant disclosed to Meta (*inter alia*) the specific title of the video material that was requested or obtained (including the URL where such material is available), along with the FID of the person who requested or obtained it (which, as discussed above, uniquely identified the person).

67.     At all times relevant hereto, Defendant knew the Meta Pixel was disclosing its consumers' Private Viewing Information to Meta.

68.     Although Defendant could easily have programmed its Websites so that none of its consumers' Private Viewing Information is disclosed to Meta, Defendant instead chose to program its Websites so that all of its consumers' Private Viewing Information is disclosed to Meta.

69.     Before transmitting its consumers' Private Viewing Information to Meta, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

70.     By intentionally disclosing to Meta Plaintiff's and its other consumers' FIDs together with the specific video material that they each requested or obtained (including the URL where such material is available), without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

### C. Defendant Knowingly Discloses Private Viewing Information of its Customers to Meta through the Custom Audience Feature

71.     Upon information and belief, Defendant has created and maintains a list of its target audience of customers or "custom audience", which identifies the interactions (including Private Video Information) that each customer takes on Defendant's website to better serve advertisements of additional products to those customers.[30]

72.     Once a company like Defendant uploads a list to Meta, it does so with the knowledge that Meta then matches the information received from the list to identify the corresponding user's Facebook and Instagram accounts.[31]

73.     In this case, Defendant created a "custom audience" that contained Plaintiff's and putative class members' Private Video Information. Specifically, it

---

[30] Meta Business Help Center, About Custom Audiences, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Jan. 2, 2025).

[31] *Id.*

1  included Plaintiff's Private Video Information (including her name, email address, and

2  physical address, and the purchase interactions she made on its website). This

3  information allowed Meta to identify Plaintiff and other unnamed class members'

4  Instagram and Facebook accounts and identified them as video purchasers from

5  Defendant's website.

6      74.    At all times relevant hereto, Defendant knew the custom audience feature

7  would disclose its customers' Private Viewing Information to Meta.

8      75.    Although Defendant could easily have programmed its custom audience

9  tool so that none of its customers' Private Viewing Information is disclosed to Meta,

10  Defendant instead chose to program the custom audience tool so that all of its

11  customers' Private Viewing Information is disclosed to Meta.

12     76.    Before transmitting its customers' Private Viewing Information to Meta

13  via the custom audience tool, Defendant failed to notify any of them that it would do

14  so, and none of them have ever consented (in writing or otherwise) to these practices.

15     77.    By intentionally disclosing to Meta Plaintiff's and its other customers'

16  Private Viewing Information in a list, without any of their consent to these practices,

17  Defendant knowingly violated the VPPA on an enormous scale.

18                          **CLASS ACTION ALLEGATIONS**

19     78.    Plaintiff seeks to represent a class defined as all persons in the United

20  States who, during the two years preceding the filing of this action, requested or

23

1    obtained prerecorded video material as a consumer to any of Defendant's Websites

2    while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

3        79.    Class members are so numerous that their individual joinder herein is

4    impracticable.  On information and belief, members of the Class number in at least the

5    tens of thousands.  The precise number of Class members and their identities are

6    unknown to Plaintiff at this time but may be determined through discovery.  Class

7    members may be notified of the pendency of this action by mail and/or publication

8    through the records of Defendant.

9        80.    Common questions of law and fact exist for all Class members and

10   predominate over questions affecting only individual class members.  Common legal

11   and factual questions include but are not limited to (a) whether Defendant embedded

12   Meta Pixel on its Websites that monitor and track actions taken by consumers to its

13   Websites; (b) whether Defendant reports the actions and information of consumers to

14   Meta; (c) whether Defendant knowingly disclosed Plaintiff's and Class members'

15   Private Viewing Information to Meta; (d) whether Defendant's conduct violates the

16   Video Privacy Protection Act, 18 U.S.C. § 2710; and (e) whether Plaintiff and each

17   Class member are entitled to a statutory damage award of $2,500, as provided by the

18   VPPA.

19       81.    The named Plaintiff's claims are typical of the claims of the Class in that

20   Defendant's conduct toward the putative class is the same.  That is, Defendant

24

embedded Meta Pixel on its Websites to monitor and track actions taken by Plaintiff and all Class members and transmit this data to Meta.  Further, the named Plaintiff and the Class members all suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendant's uniform and wrongful conduct in intentionally disclosing their Private Viewing Information to Meta.

82.     Plaintiff is an adequate representative of the Class because he is interested in the litigation; his interests do not conflict with those of the Class members he seeks to represent; he has retained competent counsel experienced in prosecuting class actions and who intends to prosecute this action vigorously.  Plaintiff and his counsel will fairly and adequately protect the interests of all Class members.

83.     The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues.    Individualized litigation also presents a potential for inconsistent or contradictory judgments.   In contrast, the class action device presents far fewer

management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CLAIM FOR RELIEF
### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710
### (By Plaintiff, Individually and on Behalf of the Class, Against Defendant)

84.     Plaintiff repeats the allegations asserted in the preceding paragraphs as if fully set forth herein.

85.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

86.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]"  Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

87.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider."  As alleged above, Plaintiff and Class members are each a "consumer" within the meaning of the VPPA because they either purchased prerecorded video material from Defendant's www.scientology.org website or created an ongoing relationship with Defendant by subscribing to one of Defendant's Websites and then requested or obtained prerecorded video material from that website.

88.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  As alleged above, Defendant transmitted to Meta the "personally identifiable information," as defined in 18 U.S.C. § 2710(a)(3), of Plaintiff and all Class members when Plaintiff and each of the Class members requested or obtained prerecorded video materials as a subscriber to any one of Defendant's Websites or purchaser on Defendant's www.scientology.org website.

89.     Specifically, when Plaintiff and each of the Class members purchased, requested, or obtained prerecorded video materials from Defendant's Websites, Defendant systematically transmitted to Meta, via the Meta Pixel technology installed on its Websites, information that specifically identified Plaintiff and each Class member as an individual who "requested or obtained" particular prerecorded video

material from Defendant via its Websites (including their unique FID along with information identifying the specific title of the prerecorded video requested or obtained by them).

90.    Defendant knowingly disclosed Plaintiff's and Class members' Private Viewing Information to Meta via the Meta Pixel technology because Defendant intentionally installed and programmed the Meta Pixel code on its Websites, knowing that such code would transmit to Meta the titles of the prerecorded video materials requested or obtained by its consumers coupled with its consumers' unique personally identifying identifiers (including FIDs).

91.    Prior to transmitting the personally identifying information of Plaintiff and Class members to Meta, Defendant failed to obtain informed written consent from Plaintiff or any member of the Class authorizing it to disclose their Private Viewing Information to Meta or any other third party.  More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who requested or obtained prerecorded video material on its Websites (including Plaintiff or any Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an

opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

92.     By systematically disclosing Plaintiff's and Class members' Private Viewing Information to Meta, Defendant violated each of these persons' statutorily protected right to privacy in their Private Viewing Information – in clear violation of the VPPA

93.     Consequently, Defendant is liable to Plaintiff and each Class member for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant Church of Scientology International as follows:

a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b)     For an order declaring that Defendant's conduct as described herein violated the VPPA;

c)     For an order finding in favor of Plaintiff and the Class and against Defendant on all counts asserted herein;

1        d)    For an award of $2,500.00 to Plaintiff and each of the Class members, as

2    provided by 18 U.S.C. § 2710(c);

3        e)    For an order permanently enjoining Defendant from disclosing the Private

4    Viewing Information of its consumers to third parties in violation of the VPPA;

5        f)    For prejudgment interest on all amounts awarded; and

6        g)    For an order awarding punitive damages, reasonable attorneys' fees, and

7    costs to counsel for Plaintiff and the Class under Rule 23 and 18 U.S.C. § 2710(c).

8

9

10    **JURY DEMAND**

11        Plaintiff, individually and on behalf of members of the Class, demands a trial by

12    jury on all causes of action and issues so triable.

13

14    Dated: February 14, 2025        Respectfully submitted,

15                            */s/ Frank S. Hedin*
                        Frank S. Hedin

16                            **HEDIN LLP**
                        1395 Brickell Ave., Suite 610

17                            Miami, Florida 33131-3302
                        Telephone: (305) 357-2107

18                            Facsimile: (305) 200-8801
                        fhedin@hedinllp.com

19                            – and –

20                            Adrian Gucovschi*

Nathaniel Haim Sari*
**Gucovschi Rozenshteyn, PLLC**
140 Broadway, FL 46
New York, NY 10005
Telephone: (212) 884-4230
adrian@gr-firm.com
nsari@gr-firm.com

*Counsel for Plaintiff and the Putative Class*

*\* Pro Hac Vice Application forthcoming*